RECEIVED & FILED

JAN 2 5 2010

OFFICE OF THE BANKRUPTCY CLERK
ALBANY, NY

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

---

In re:                                              Chapter 11

    LINCOLN LOGS LTD.,                       Case No. 08-13079

                Debtor(s).         (Jointly Administered)

---

In re:

    SNAKE RIVER LOG HOMES, LLC,              Case No. 08-13080

                Debtor(s).

---

APPEARANCES:

| | |
|---|---|
| Phillips Lytle, LLP<br>*Attorneys for Debtors*<br>Suite 3400<br>One HSBC Center<br>Buffalo, NY 14203<br>and<br>Omni Plaza<br>30 South Pearl Street<br>Albany, NY 12207 | Angela Z. Miller, Esq.<br>William J. Brown, Esq.<br><br><br><br><br>Todd A. Ritschdorff, Esq. |
| Harris Beach PLLC<br>*Attorneys for First Pioneer Farm Credit, ACA*<br>One Park Place, 4th Floor<br>300 South State Street<br>Syracuse, NY 13202 | Kelly C. Griffith, Esq. |
| Nolan & Heller, LLP<br>*Attorneys for Official Committee of Unsecured Creditors*<br>39 North Pearl Street, 3rd Floor<br>Albany, NY 12207 | Justin A. Heller, Esq. |
| Robert J. Rock, Esq.<br>*Attorney for Donald L. Brenner and Lisa R. Brenner*<br>60 South Swan Street<br>Albany, NY 12210 | |

Hon. Robert E. Littlefield, Jr., Chief United States Bankruptcy Judge

1

## MEMORANDUM-DECISION AND ORDER

Currently before the court are the omnibus motion filed by Donald L. Brenner and Lisa R. Brenner ("Brenners") seeking turnover of goods purchased from Lincoln Logs, Ltd. ("Lincoln Logs") and for other relief pursuant to 11 U.S.C. § 105 and the accompanying objections to the motion filed by the secured creditor First Pioneer Farm Credit, ACA ("First Pioneer") and the Official Committee of Unsecured Creditors ("Creditors' Committee").[1] For the reasons set forth below, the court grants the Brenners' motion.

## JURISDICTION

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), 157(b)(1), 157(b)(2)(E), 157(b)(2)(K), 157(b)(2)(O), and 1334(b).

## FACTS

Lincoln Logs was a log home manufacturer headquartered in Chestertown, New York. It was distinguished by its variety of solid log profiles and sizes, panelized wall systems, abundant standard designs, custom plans, engineering services, and national sales network. Prior to the closing of its sales office in April 2008, Lincoln Logs' wholly-owned subsidiary Snake River Log Homes, LLC ("Snake River") produced pre-packaged log homes in the Swedish Cope style (a style of log home prevalent on the west coast). Snake River has ceased operating.

On September 19, 2008, Lincoln Logs and Snake River (collectively, the "Debtors") filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code. The cases are being jointly administered pursuant to the Order for Joint Administration entered on September 22, 2008. The Debtors filed a Chapter 11 Joint Plan of Liquidation on March 5, 2009 and an Amended Chapter 11 Joint Plan of Liquidation on May 4, 2009. (Nos. 188; 254 Ex. A.) By order dated July 20, 2009, the Amended Chapter 11 Joint Plan of Liquidation (the "Plan") was

---

[1] Unless otherwise noted, all statutory references herein are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532.

confirmed, and a liquidating trust was formed with Justin A. Heller, Esq. ("Liquidation Trustee") appointed as trustee thereof. The Plan provides for an absolute priority distribution to holders of claims against the Debtors.

Prior to the petition date, on July 3, 2006, the Brenners entered into a purchase agreement ("Purchase Agreement") with Lincoln Logs for the purchase of a Custom Chalet log home ("Custom Chalet"). The Purchase Agreement sets forth the specifications for the Custom Chalet by way of handwritten notes and checkmarks. For example, a blank space appears next to the typewritten words "Standard Design" whereas the handwritten inscription "Custom Chalet" appears next to the typewritten words "Custom Design." Similarly, handwritten notes set the "Dimensions" of the Custom Chalet as "58 x 36'," the "Log Size" as "8"," and the "Shingle Color" as "T.B.D." For the respective categories of "Wood Species," "Wall System," and "Profile," checkmarks appear in the boxes next to the words "Pine," "Log," and "D-Log" while blank boxes appear next to the words "Cedar," "Thermo-Home," "Lincoln Panel," "Round/Round," "4" WB," "8" WB," "Swedish Cope," and "Other." Handwritten notes in the "Options/Upgrades" section of the Purchase Agreement call for a "58 x 10 Cedar Deck" and indicate that the purchase price "Includes 1st FL system w/ Advantec." Finally, the Windows & Doors Addendum to the Purchase Agreement details the number, style, and models of the individually selected "Vetter HiPro 4 windows (Clad Color T.B.D.)" along with the number, style, size, and models of the individually selected doors. For both the windows and doors, the column for "Total Retail Price" is blank.

The Purchase Agreement was amended seven times through sales agreement amendment forms. The seventh and final amendment form, dated August 27, 2008, substituted BiltBest (black clad) brand windows for the previously selected Vetter brand windows and set the final

3

purchase price of the Custom Chalet at $111,008.88. Pursuant to the Purchase Agreement and amendments, Lincoln Logs was to deliver the Custom Chalet to the Brenners' property located on Hurds Road in Ulster County.[2]

The Brenners paid for the Custom Chalet in full. The Purchase Agreement payment schedule provides for a 10 percent deposit, a 40 percent "Pre-cutting Payment," with the 50 percent balance to be paid by certified check. (No. 239 Ex. A.) The Brenners made corresponding payments in the amounts of $11,454.48, $44,248.68, and $55,305.72 for a total of $111,008.88. (No. 239 Ex. C.) The Brenners' additional payment of $1,630.11 on August 7, 2009 apparently corresponds with the freight charges in the Purchase Agreement. (*See* No. 239 Ex. C (check number 656 payable to Debtor in the amount of $1,630.11); No. 239 Ex. A ("Cap Freight at $1600.00").) Lincoln Logs has delivered certain portions of the Brenners' Custom Chalet. The present dispute arises from its failure to deliver remaining portions of the Custom Chalet, namely, siding, windows, doors, and interior tongue and groove boards.

On January 20, 2009, the Brenners timely filed a proof of claim asserting their rights to the undelivered goods or, in the alternative, to repayment in the amount of the value of such goods. (Claim No. 305-1.) The original proof of claim lists the Brenners' claim as a secured claim in the amount of $167,944.71. (Claim No. 305-1.) The Brenners filed an amended proof of claim on November 20, 2009, changing the secured claimed amount from $167,944.71 to

---

[2] It is undisputed that the Brenners own the parcel of land listed as the delivery site for the Custom Chalet. At oral argument, counsel for the Brenners described how the Brenners purchased a small farm in the Catskills as the site for their future home. The Purchase Agreement lists the Brenners' address as 5 Lorraine Meadows Highland, NY 12528 and the delivery site address as Hurds Road, Clintondale, Ulster County, NY. The court takes judicial notice of the Ulster County Real Property Tax Assessor Record listing Donald and Lisa Brenner (mailing address 5 Lorraine Meadows Rd. Highland, NY 12528) as the owners of record of Assessor's Parcel Number 3200-094.002-0002-004.122-0000, a 5.68 acre agricultural lot located at 23 Hurds Rd., Highland, NY 12528. *See* Fed. R. Evid. 201. Review of an Ulster County map reveals that Hurds Road runs through the adjacent hamlets of Clintondale and Highland, thus explaining the discrepancy between the delivery site address in the Purchase Agreement and the address listed on the Ulster County Real Property Tax Assessor Record. *See id.*

Main Document      Page 5 of 15

$55,000, representing the alleged value of the undelivered portions of the Custom Chalet.[3] (Claim No. 305-3.)

On April 21, 2009, the Brenners filed the instant omnibus motion seeking turnover of the undelivered goods and other relief. (No. 239.) The motion was opposed by First Pioneer, a secured creditor with a security interest in all of Lincoln Logs' tangible and intangible personal property, the Creditors' Committee, and the Debtors. (Nos. 248; 250; 251.) The court held a hearing on May 6, 2009. After oral argument, the matter was adjourned to allow the parties to submit additional arguments in support of their respective positions. On May 29, 2009, the Brenners filed a supplement to the omnibus motion and a memorandum of law in support of the omnibus motion. (Nos. 278; 279.) First Pioneer filed a supplemental objection on June 11, 2009. (No. 288.) The Creditors' Committee filed an objection on June 12, 2009. (No. 295.) Pursuant to the June 19, 2009 Briefing Order (No. 307), the Brenners filed a Supplemental Memorandum of Law in Support of Omnibus Motion on July 24, 2009. (No. 331.) The Liquidation Trustee filed a response to the supplemental memorandum on August 14, 2009. (No. 350.)

## ARGUMENTS

The Brenners assert a right to the immediate return of funds representing the value of the undelivered goods. They argue that such funds do not constitute a § 507(a)(7) "deposit in . . . connection with the purchase" but rather form the basis of a trust in their favor. They advance two theories, in law and equity, for imposing a trust. The legal theory hinges on the interplay of section 770 of New York's General Business Law ("GBL") with section 71-a of New York's Lien Law, which requires that advances made to home improvement contractors in regard to

---

[3] The Brenners acknowledge that Lincoln Logs' bankruptcy and liquidation have rendered moot their request for specific performance. The claim amount is based on the information and belief of Brenners' counsel and the alleged representations of the Debtors' sales representative, Cindy Johansen. The exact amount of the claim is disputed.

5

home improvement contracts be held in escrow or trust. The Brenners argue that the disputed funds became the subject of a statutory trust because the Purchase Agreement was a "home improvement contract" paid for in full by the Brenners prior to its completion. In the alternative, the Brenners argue that the estate's property was impressed with a constructive trust and that their equitable interests did not become property of the estate under 11 U.S.C. § 541(d).[4]

First Pioneer argues that the Purchase Agreement is merely a contract for the sale of goods and not a "home improvement contract." As a result, First Pioneer asserts, the Purchase Agreement provides no basis for imposing a statutory trust. In response to the Brenners' equitable argument, First Pioneer raises the countervailing concerns that imposing a constructive trust in favor of the Brenners would disrupt the priority of claims and create the inequity of depriving other creditors of their interests in this case. Thus, First Pioneer concludes that the Brenners have at most a priority unsecured claim and a general unsecured claim that are junior to First Pioneer's secured claim.

The Creditors' Committee joins in the objection filed by First Pioneer. Similarly, the Debtors join in the objection filed by First Pioneer and argue that the Brenners' claim is not an administrative expense claim with the meaning § 503. In alliance with First Pioneer, the Debtors argue that granting the Brenners' motion would result in the immediate payment of a priority unsecured claim and a general unsecured claim in violation of the absolute priority rule.

---

[4] Section 541 provides, in relevant part:
> (a) The commencement of a case under section 301 . . . of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>> (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.
>
> . . . .
> (d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) . . . of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541.

6

The Liquidation Trustee disputes the amount of the Brenners' claim and questions whether, on a total purchase of $111,008.88, the undelivered goods could have a value of $55,000. The Liquidation Trustee further argues against the imposition of a constructive trust.

## DISCUSSION

### I. Statutory Trust

Section 771(e) of the GBL requires a home improvement contract to contain a notice that the contractor is required to "deposit all payments received prior to completion in accordance with subdivision four of section seventy-one-a of the lien law." N.Y. Gen. Bus. Law § 771(e) (McKinney 2009). Subdivision 4 of section 71-a of New York's Lien Law, in turn, requires a home improvement contractor to hold such payments in an escrow account in a bank, trust company, savings bank, or state or federal savings and loan association located in the state of New York. N.Y. Lien Law § 71-a(4)(a) (McKinney 2009).

### A. Home Improvement Contract

In determining the existence of a statutory trust in this case, the court must first decide whether Article 36-A of the GBL applies to the Brenners' purchase of their log home from Lincoln Logs, i.e., whether the Purchase Agreement was a "Home Improvement Contract" under the GBL. GBL section 770(6), in relevant part, defines a "home improvement contract" as "an agreement for the performance of home improvement, between a home improvement contractor and an owner, and where the aggregate contract price specified in one or more home improvement contracts, including all labor, services and materials to be furnished by the home improvement contractor, exceeds five hundred dollars." N.Y. Gen. Bus. Law § 770(6). The deciding factors, therefore, are: (1) whether the Purchase Agreement is an agreement for the performance of "home improvement;" (2) whether Lincoln Logs is a "home improvement

7

contractor;" (3) whether the Brenners are "owners;" and (4) whether Purchase Agreement contract price exceeds $500. These factors are discussed in turn below.

### 1. Whether the Purchase Agreement Is an Agreement for the Performance of "Home Improvement."

Subsection 770(3) of the GBL defines "home improvement" as, among other things, "the construction of a custom home." N.Y. Gen. Bus. Law § 770(3) (McKinney 2009). Pursuant to subsection 770(3)(a), home improvement does not include "the sale or construction of a new home, other than a custom home as defined in [section 770]." *Id.* § 770(3)(a). "'Custom home' means a new single family residence to be constructed on premises owned of record by the purchaser at the time of contract, provided that such residence is intended for residential occupancy by such purchaser." *Id.* § 770(7).

Preliminarily, the court recognizes that the Brenners' Custom Chalet was a "custom home." It is uncontroverted that the Brenners intended to occupy the Custom Chalet as their residence. *See supra* note 2 and accompanying text. Moreover, the Custom Chalet was to be constructed on premises owned by the Brenners on Hurds Road. *See id.* Therefore, the Brenners' "Custom Chalet" qualifies as a "custom home" under the GBL.

First Pioneer argues that the Purchase Agreement was a contract for the sale of goods as opposed to a home improvement contract. In support of its argument, First Pioneer relies on the fact that Lincoln Logs supplies log home building packages but depends on third party contractors to assemble those packages. This argument presents a question of statutory interpretation—whether "home improvement" is limited to the construction of a custom home or whether it includes either the sale or construction of a custom home.

A review of New York cases has provided little guidance towards resolution of the matter. Instead, the court looks to "well-established principles of statutory interpretation that

8

require statutes to be construed in a manner that gives effect to all of their provisions." *United States ex rel. Eisenstein v. City of New York*, 129 S. Ct. 2230, 2234 (2009) (citations omitted); *accord People v. Ryan*, 274 N.Y. 149, 152 (1937) (citations omitted). "'The legislative intent is to be ascertained from the words and language used, and the statutory language is generally construed according to its natural and most obvious sense, without resorting to an artificial or forced construction.'" *Frank v. Meadowlakes Dev. Corp.*, 6 N.Y.3d 687, 692 (2006) (quoting McKinney's Consol. Laws of N.Y., Book 1, Statutes § 94). Only when these principles of statutory interpretation fail to reveal the legislature's intent will the court turn to other "indicia of legislative intent," New York's equivalent of legislative history materials. *See, e.g., In re Long Beach Grandell Nursing Home & Health Related Facility*, 402 N.Y.S.2d 308, 309 (N.Y. Co. Ct. 1978) (citation omitted).[5]

The plain language of GBL section 770 includes within the definition of "home improvement" the sale of a custom home. The penultimate sentence of the opening paragraph of 770(3) reads as follows: "'Home improvement' shall also mean the construction of a custom home, the installation of home improvement goods or the furnishing of home improvement services." *Id.* § 770(3). Immediately following are the sentence "'Home improvement' shall not include" and paragraph (a), which excludes from the definition of home improvement "the *sale or* construction of a new home, *other than a custom home*." *Id.* § 770(3)(b) (emphasis added). As a matter of inexorable logic it follows that the contrapositive also holds true. *See Teichberg v. D. H. Blair & Co.*, 63 Misc.2d 1073, 1077–78 (N.Y. Sup. Ct. 1970). Thus, home

---

[5] Unfortunately, there exists no equivalent of the United States Code Congressional and Administrative News for New York State legislative history materials. *See* Robert Alan Carter, Legislative Intent in New York State 5 (2d ed. 2001) ("Probably the greatest problem a researcher has to face in determining the legislative intent of a New York State statute is the paucity of materials to work with. Committee reports, debates, hearings, etc. which are so readily available on the Federal level are usually nonexistent on the State level."). Nonetheless, an important repository for legislative intent in New York may be found in bill jackets, which contain memoranda and letters regarding the proposed legislation. *Id.* at 13.

improvement includes the sale or construction of a custom home. Adhering to conventional principles of statutory interpretation, the court concludes that a home improvement under the GBL includes either the sale or construction of a custom home.

Even if the court were to deem GBL section 770 to be somehow ambiguous, the court finds no suggestion in the statutory text or elsewhere that the legislature intended to exclude from home improvement the sale of a custom home. To the contrary, the indicia of legislative intent support the court's construction. The 1989 amendment, styled as "AN ACT to amend the general business law, the personal property law and the lien law in relation to home improvement contracts," amended Article 36-A of the GBL "to bring custom homes within the definition of home improvement." Bill Jacket, L. 1989, ch. 32, at 18, Memorandum of Senator Eugene Levy. Its purpose was to "extend[] transaction protection to buyers of custom homes." *See id.* Furthermore, the Consumer Protection Board strongly supported the amendment because it "provides important consumer protections to the owners of custom homes." Bill Jacket, L. 1989, ch. 32, at 21, Memorandum from Patricia L.R. Rodriguez, Deputy Counsel, State Consumer Protection Board, to Evan A. Davis, Counsel to the Governor (Mar. 29, 1989). The New York City Mayor's Office also supported statewide regulation of home improvement contracts to redress, among other concerns, the "abandonment of incomplete jobs after full payment has been received." Bill Jacket, L. 1989, ch. 32, at 61–62, Letter from City of New York, Office of the Mayor, to Hon. Mario Cuomo, Governor of the State of New York (July 27, 1987); *see also* Bill Jacket, L. 1989, ch. 32, at 28–29, Memorandum from Robert Abrams, Attorney General, State of New York Department of Law, to Hon. Mario Cuomo, Governor of the State of New York (describing importance of the proposed legislation to protect consumers against "contractors' insolvency; diversion of contract funds; abandonment of jobs; inadequate performance, including

. . . deviation from contract specifications, and unfinished work"). The legislative history outlined above clearly demonstrates that it was the intent of the legislature to protect purchasers of custom homes, such as the Brenners, from non-performing contractors, such as Lincoln Logs.

First Pioneer places great emphasis on the opening paragraph of 770(3), which refers to the construction of a custom home but makes no mention of the sale of a custom home. Such a reading, however, ignores other sections of the statute that reference the purchase of a custom home and the contract of sale for a custom home. *See* N.Y. Gen. Bus. Law §§ 770(2), 770(7) (McKinney 2009). More significantly, First Pioneer's reading ignores paragraph (a) and its logical derivation that home improvement, while excluding the sale or construction of a new home, necessarily includes the sale or construction of a custom home.

First Pioneer additionally relies on paragraph (b), which excludes from the definition of home improvement "the sale of goods by a seller who neither arranges to perform nor performs, directly or indirectly, any work or labor in connection with the installation or application of the goods." *Id.* § 770(b). Its reliance is misplaced for two reasons. First, the Purchase Agreement deals with the sale of a custom home, not the sale of goods. Lincoln Logs took pride in its engineering services and custom design plans. The Purchase Agreement outlines in great detail the specifications of the Brenner's Custom Chalet. To say, as First Pioneer argues, that Lincoln Logs merely sells goods is to dismiss entirely the foundation of Lincoln Logs' business. In short, the Custom Chalet is more than the sum of its parts. Second, even if the Purchase Agreement were characterized as a sale of goods, paragraph (b) remains inapplicable because Lincoln Logs directly and indirectly arranges to perform and performs work in connection with the installation of its "goods." Directly, Lincoln Logs delivered part of the Custom Chalet to the Brenners, as evidenced by the Brenners' August 7 payment. Indirectly, Lincoln Logs recommends

contractors to its customers. It is of no import that the purchase prices of Lincoln Logs' homes do not include delivery or that Lincoln Logs disclaims liability for the improper construction of its homes. Lincoln Logs delivers the homes and arranges for their construction. Therefore, paragraph (b) does not exclude from the definition of home improvement the sale of the Brenners' Custom Chalet.

Finally, First Pioneer relies on the absence of the statutorily required notice in the Purchase Agreement as evidence that the Purchase Agreement was not a home improvement contract. The argument rings hollow. Failure to include the required notice does not render a home improvement contract per se unenforceable. *E.g., Porter v. Bryant*, 681 N.Y.S.2d 582, 583 (2d Dep't 1998). Nor does it transmute an otherwise valid home improvement contract into a contract for the sale of goods. *See id.*; *see also Clancy v. Golberg*, 183 B.R. 672, 676 n.3 (N.D.N.Y. 1995) ("[T]he [home improvement] contract was not in the form required under the General Business Law of New York, however, it was subject to the substantive and procedural requirements of state law."). Based upon the foregoing, the Purchase Agreement was an agreement for the performance of "home improvement."

## 2. Whether Lincoln Logs Is a "Home Improvement Contractor"

Under the GBL, a "home improvement contractor" includes a "corporation which . . . agrees to perform any home improvement for a fee and for whom the total cash price of all of his home improvement contracts with all his customers exceeds one thousand five hundred dollars during any period of twelve consecutive months." N.Y. Gen. Bus. Law § 770(5) (McKinney 2009). As discussed previously, home improvement includes the sale of custom homes. Lincoln Logs is a corporation that sells custom homes for a fee. The total cash price of all of its home improvement contracts well-exceeds the $1,500 requirement. Therefore, Lincoln Logs is a home improvement contractor.

12

### 3. Whether the Brenners Are "Owners"

Included in the GBL's definition of "owner" is "any person who purchases a custom home as defined in [section 770]." N.Y. Gen. Bus. Law § 770(2) (McKinney 2009). The Brenners are owners because they purchased a custom home, the Custom Chalet.

### 4. Whether Purchase Agreement Contract Price Exceeds $500

The $111,008.88 Purchase Agreement contract price exceeds $500. Thus, based upon the above factors, the court finds that the Purchase Agreement was a "Home Improvement Contract" under the GBL. Accordingly, the provisions of New York Lien Law § 71-a apply.

### B. New York Lien Law § 71-a

In *Clancy v. Goldberg*, the United States District Court for the Northern District of New York summarized the applicability New York Lien Law in the context of home improvement contracts as follows:

> The applicability of New York Lien Law § 71-a to home improvement contracts is witnessed by the requirement of General Business Law § 771(1)(e) that the provisions of such contracts contain a notice to the owner purchasing the home improvement that, generally, a contractor is required to deposit all payments received prior to completion of the project in accordance with § 71-a of the Lien Law, or that "in lieu of such deposit, the home improvement contractor may post a bond, contract of indemnity or irrevocable letter of credit with the owner guaranteeing the return or proper application of such payments to the purposes of the contract." N.Y. Gen. Bus. Law § 771(1)(e) (McKinney 1995 Supp.).
>
> Lien Law § 71-a requires that advances made in regard to home improvement contracts be held in an escrow account in a bank, trust company, savings bank, or state or federal savings and loan association located in New York State. N.Y. Lien Law § 71-a(4)(a) (McKinney 1993). This money remains the property of the home owner until the home improvement contractor substantially performs under the terms of the contract, the home owner defaults or breaches the contract, thus excusing performance by the contractor, or the contractor applies the money to the purpose of the home improvement contract under the schedule of payments provided therein. N.Y. Lien Law § 71-a(4)(d) (McKinney 1993). The contractor is not required to keep the deposits of customers in separate

13

accounts, but may mix the funds so long as the contractor's records clearly keep track of the allocation of each customer's funds. N.Y. Lien Law § 71-a(4)(a) (McKinney 1993).

183 B.R. 672, 675–76 (N.D.N.Y. 1995). There is no assertion that the Brenners defaulted or breached the contract. Rather, they paid for the Custom Chalet in full. Nor is there an assertion Lincoln Logs applied the funds toward the purpose of the Purchase Agreement. Lincoln Logs failed to deliver the entire Custom Chalet despite receiving the entire balance due under the Purchase Agreement. Thus, under New York Lien Law, the money paid by the Brenners to Lincoln Logs for the undelivered portions of the Custom Chalet should have remained at all times in escrow for the Brenners.

### C. Applicability of the Bankruptcy Code

Section 541 provides, in relevant part, that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Here, because the funds paid by the Brenners "were to be held in escrow by law, and because of the aforementioned facts of this case, the [Debtors] had neither a legal nor an equitable interest, and so the funds are not part of the bankruptcy estate." *See Clancy*, 183 B.R. at 676 (holding that money deposited in escrow "remains the property of the home owner until the home improvement contractor substantially performs under the terms of the contract, the home owner defaults or breaches the contract, thus excusing performance by the contractor, or the contractor applies the money to the purpose of the home improvement contract under the schedule of payments provided therein.").

### II. Constructive Trust

Because there exists a sufficient basis in law to grant the Brenners' motion, the court declines to invoke any of its equitable powers under the facts presented. *See In re*

14

*Carrow*, 315 B.R. 8, 16 (Bankr. N.D.N.Y. 2008) (citing *In re Barbieri*, 199 F.3d 616, 619, 621 (2d Cir. 1999)).

## CONCLUSION

Based upon the foregoing, it is hereby

ORDERED, that the Brenners' request for payment corresponding to the value of the undelivered portions of the Custom Chalet is granted; and it is further

ORDERED, that the parties are directed to appear on January 27, 2010 at 10:30 a.m. to discuss the value of the undelivered portions of the Custom Chalet and how to proceed in compliance with the court's decision and order.

It is so ORDERED.

Dated: January 25, 2010

Hon. Robert E. Littlefield, Jr.
Chief United States Bankruptcy Judge